# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MENACHEM KUSHNERSKI, | ) | CASE NO. 1:23-CV-00904-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BENITA Y. PEARSON |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff, Menachem Kushnerski ("Mr. Kushnerski"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF No. 1.) U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

Mr. Kushnerski filed an application for DIB on March 10, 2015, alleging a disability onset date of June 14, 2008. (Tr. 155-56.)[1] His application is related to degenerative disc disease; myofascial pain dysfunction disorder; chronic pain syndrome; major depressive disorder; schizophrenia; and generalized anxiety disorder. (*See* Tr. 214, 244, 610.) His application was denied initially and upon reconsideration. (Tr. 105-08.) An administrative law judge ("ALJ") held

---

[1] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF.

a hearing on April 26, 2017. (Tr. 32-60.) Mr. Kushnerski, represented by counsel, testified with the assistance of an interpreter. (*Id.*) A vocational expert ("VE") also testified. (*Id.*) The ALJ issued a written decision on September 13, 2017, finding that Mr. Kushnerski was not disabled under the meaning of the Social Security Act. (Tr. 15-26.) The ALJ's decision became final on April 10, 2018, when the Appeals Council declined further review. (Tr. 1-3.) Mr. Kushnerski requested judicial review.

On September 24, 2019, the U.S. District Court for the Northern District of Ohio remanded Mr. Kushnerski's case for further consideration of Dr. Goldman's opinion. (Tr. 667.) After a new hearing on June 26, 2020, the ALJ issued another decision on July 21, 2020, finding Mr. Kushnerski was not disabled between his amended alleged onset date of January 1, 2017, and December 31, 2019. (Tr. 607-28, 790.) The ALJ's decision became final on March 3, 2023, when the Appeals Council declined further review. (Tr. 1-3.)

On May 2, 2023, Mr. Kushnerski filed his Complaint, challenging the Commissioner's final decision. (ECF No. 1.) Mr. Kushnerski asserts the following assignment of error:

(1) Whether the administrative law judge's decision is supported by substantial evidence when it did not accord great weight to the treating physician's opinion.

(ECF No. 7, PageID#1054.)

### III. BACKGROUND INFORMATION[2]

#### A. Personal, Educational, and Vocational Experience

Mr. Kushnerski was born in 1975. (Tr. 155.) He completed the ninth grade at a public school in Russia, but he did not obtain a GED once he moved to the United States. (*See* Tr. 21,

---

[2] This summary will focus on the evidence related to Mr. Kushnerski's mental impairments because Mr. Kushnerski does not challenge the ALJ's assessment of his physical impairments.

395.) His past relevant work experience was employment as a pastoral assistant and calligrapher.
(Tr. 53, 224.)

        **B.**  **Relevant Non-Medical/Medical Opinion Evidence**

          **1.**  *Zyama Goldman, M.D.*

            **a.**  **Mental Residual Functional Capacity Questionnaire – July 2016**

Dr. Goldman completed a Mental Residual Functional Capacity Questionnaire on July 26, 2016. Out of 25 categories of workplace functioning, Dr. Goldman indicated Mr. Kushnerski had "no useful ability to function"[3] in ten of the domains. (Tr. 552-53.) These domains included his abilities to maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. (*Id.*)

Dr. Goldman indicated Mr. Goldman was "unable to meet competitive standards"[4] in the domains of remembering work-like procedures; maintaining attention for two-hour segments; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an

---

[3] The form defines "no useful ability to function" as an extreme limitation, meaning that the patient "cannot perform th[e] activity in a regular work setting." (Tr. 552.)

[4] The form defines "unable to meet competitive standards" to mean that the patient "cannot satisfactorily perform th[e] activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 552.)

unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; and being aware of normal hazards and taking appropriate precautions. (Tr. 552.)

Dr. Goldman opined that Mr. Goldman's functioning was "seriously limited but not precluded"[5] in the domains of understanding and remembering very short and simple instructions; carrying out very short and simple instructions; interacting appropriately with the general public; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; and travelling in unfamiliar places. (Tr. 552-53.) Dr. Goldman then indicated that Mr. Kushnerski's functioning was "limited but satisfactory" in the domains of asking simple questions or requesting assistance and using public transportation. (*Id.*) Finally, Dr. Goldman indicated that Mr. Kushnerski could work no more than four days per month. (Tr. 554.)

### b. Mental Residual Functional Capacity Questionnaire – October 2019

Dr. Goldman completed another Mental Residual Functional Capacity Questionnaire on October 10, 2019. Dr. Goldman reported that Mr. Kushnerski had regular appointments with him every one to three months. (Tr. 982.) Dr. Goldman noted that Mr. Kushnerski takes Seroquel and Gabapentin, which had side effects of dizziness and fatigue. (*Id.*) Dr. Goldman reported that Mr. Kushnerski had decreased energy, somatization unexplained by organic disturbance, mood disturbance, difficulty thinking or concentrating, paranoid thinking or inappropriate suspiciousness, emotional withdrawal or isolation, perceptual or thinking disturbances, hallucinations or delusions, emotional lability, deeply ingrained, maladaptive patterns of behavior, pathologically inappropriate suspiciousness or hostility, easy distractibility, and sleep disturbance. (Tr. 983.)

---

[5] The form defines "seriously limited but not precluded" to mean that the patient's ability to function in the domain is "seriously limited and less than satisfactory, but not precluded in all circumstances." (Tr. 552.)

Dr. Goldman opined that Mr. Kushnerski had "no useful ability to function" in most of the same areas he indicated in his July 2016 questionnaire, including maintaining regular attendance and being punctual within customary, usually strict tolerances; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; and completing a normal workday and workweek without interruptions from psychologically based symptoms. (*See* Tr. 984-85.) Dr. Goldman similarly opined that Mr. Kushnerski was "unable to meet competitive standards" in areas such as maintaining attention for two-hour segments and sustaining an ordinary routine without special supervision. (Tr. 984.) Dr. Goldman also opined that Ms. Kushnerski's impairments will cause him to be absent from work more than four days per month. (Tr. 986.)

### 2. *J. Joseph Konieczny, Ph.D.*

Mr. Kushnerski saw Dr. Konieczny on July 10, 2015, for a psychological consultative examination. Mr. Kushnerski reported that he worked steadily until 2011, and he stated that his most recent work was as a supervisor in 2011. (Tr. 395.) He reported that the reason he had not worked since 2011 was because he "got paralyzed." (*Id.*) He stated that he had experienced difficulties with his immune system for his entire life, and endorsed back pain with residual weakness and fatigue. (Tr. 396.) He reported a history of psychiatric hospitalization and outpatient counseling in the 1990s before he emigrated from Russia. (Tr. 395.) During this examination, Mr. Kushnerski stated that he had occasional anxiety, but Dr. Konieczny did not observe any subjective symptoms of nervousness or anxiety or indications of paranoid, grandiose, or otherwise unusual thinking. (Tr. 396.) Mr. Kushnerski endorsed difficulties with his memory, anxiety, insomnia, and mood swings. (*Id.*)

Dr. Konieczny observed that Mr. Kushnerski was attired in clean clothing with adequate grooming and hygiene. (*Id.*) Mr. Kushnerski moved and walked slowly and in a labored manner, and carried a cane, which he did not use to assist with walking. (*Id.*) Dr. Konieczny observed that Mr. Kushnerski was "quite elaborate in relating his symptoms and history," but was generally cooperative. (*Id.*) Dr. Konieczny also reported that the interpreter indicated that Mr. Kushnerski was articulate in his language. (*Id.*)

The examination report indicates that Mr. Kushnerski was able to concentrate and attend to task during questioning designed to assess his cognitive functioning. (*Id.*) He recalled three out of three objects after a five-minute delay; was able to spell a five-letter word backwards, showed no difficulty in his ability performing logical abstract reasoning, and respond appropriately to a task involving identity buying similarities between objects; and had an adequate fund of information. (*Id.*) Dr. Konieczny believed that Mr. Kushnerski had mild deficits in his awareness of rules of social judgment and conformity and overall judgment. (*Id.*)

Based on the available background information and the interview information, Dr. Konieczny opined that Mr. Kushnerski had no significant limitations in his ability to understand, remember, and carry out instructions, and in his attention and concentration and persistence in single and multi-step tasks. (Tr. 397.) Dr. Konieczny further opined that, as a result of Mr. Kushnerski's depressive symptoms, Mr. Kushnerski would have "diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to typical supervision and interpersonal situations in the work setting." (*Id.*)

### 3. *State Agency Opinions*

On August 14, 2015, state agency psychologist Marjorie Kukor, Ph.D. reviewed Mr. Kushnerski's record at the initial level of consideration. Dr. Kukor opined that Mr. Kushnerski's

mental impairments were not severe because they caused no more than mild limitations in functioning. (Tr. 71.) Irma Johnston, PsyD, reviewed Mr. Kushnerski's claim at the reconsideration level on December 4, 2015, and agreed with Dr. Kukor's findings.  (Tr. 86.)

### C. Relevant Medical Evidence

Mr. Kushnerski first saw Ilia Itin, M.D., a neurologist, for a "constellation of neurological and psychiatric symptoms," including chronic pain syndrome and chronic mental illness on December 10, 2014. (Tr. 361, 363.) Mr. Kushnerski reported a history that included months-long inpatient psychiatric hospitalizations in Russia when he was 19 years old for symptoms that included an intractable headache and anxiety. (Tr. 361.) Dr. Itin's examination revealed Mr. Kushnerski had normal attention, concentration, memory, fund of knowledge, and language function, but that Mr. Kushnerski was "[s]omewhat perseverant and tangential." (Tr. 363.) Dr. Itin explained that Mr. Kushnerski's case was complex due to his constellation of symptoms, which included "cognitive/behavioral problems effecting or limiting treatment options," and prescribed Mr. Kushnerski gabapentin, a pain medication. (Tr. 363-64.)

Mr. Kushnerski attended a follow-up appointment with Dr. Itin on February 10, 2015. Dr. Itin noted that Mr. Kushnerski had not had the opportunity to establish psychiatric care. (Tr. 407.) Mr. Kushnerski also agreed to undergo a psychiatric evaluation. (Tr. 375.) He reported that gabapentin helped improve his painful sensations by up to 50 percent. (Tr. 374, 407.)  On March 19, 2015, Mr. Kushnerski visited Dr. Itin again. He was still taking gabapentin. (Tr. 410.) His sharp pain was better "but he [wa]s not back to baseline" and still had discomfort in his lower back. (*Id.*)

On April 28, 2015, Mr. Kushnerski first visited Zyama Goldman, M.D., his treating psychiatrist. (Tr. 545-48.) Dr. Goldman observed that Mr. Kushnerski was well-groomed with clear speech, but he was also mistrustful, preoccupied, demanding, tangential, depressed, anxious,

and labile, with impairment of attention of attention/concentration and ideas of reference. (Tr. 546-47.) Dr. Goldman opined Mr. Kushnerski had a global assessment of functioning ("GAF") of 35 out of 100. (Tr. 547.)

Mr. Kushnerski returned to Dr. Goldman on June 8, 2015. A mental status examination revealed Mr. Kushnerski was guarded, suspicious, tangential, and circumstantial, with "distractible" and "redirectable" attention/concentration, impaired cognition, and "fair" memory. (Tr. 388.) Mr. Kushnerski also had thought contents with paranoia and delusions. (*Id.*)

On August 4, 2015, Dr. Goldman assessed Mr. Kushnerski. The mental status examination revealed labile affect, depression, paranoia, distractibility, and impaired cognition. (Tr. 399.) On November 16, 2015, Mr. Kushnerski again described symptoms including labile mood, depressed affect, distractibility, anxiousness, and impaired cognition. (Tr. 520.) Mr. Kushnerski attended a follow-up appointment with Dr. Goldman on May 16, 2016. (Tr. 514-15.) The mental status examination revealed that Mr. Kushnerski was guarded, suspicious, irritable, depressed, and anxious, with labile affect. (Tr. 514.) He had tangential thought process, paranoid and hypochondriac thought content, and auditory hallucinations. (*Id.*) He also had "distractible" and "redirectable" attention/concentration, impaired cognition, and fair memory. (*Id.*)

On January 28, 2016, Mr. Kushnerski saw Jahangir Maleki, M.D., Ph.D., for diffuse spine pain, and an unusual feeling that something was piercing the top of his head. (Tr. 495-96.) Mr. Kushnerski had some difficulty with English, but he was able to communicate. (Tr. 497.) Dr. Maleki observed that Mr. Kushnerski was coherent and mildly depressed but reactive. (*Id.*) Dr. Maleki noted that Mr. Kushnerski "otherwise…ha[d] preserve orientation to all spheres and normal higher cortical functions including language, praxis and stereognosis." (*Id.*)

8

Dr. Goldman completed a Mental Residual Functional Capacity Questionnaire on July 26, 2016. A summary of the findings is located at the "Non-Medical/Medical Opinions" section of this Report and Recommendation.

After the U.S. District Court for the Northern District of Ohio remanded this case, Mr. Kushnerski submitted additional evidence. On January 8, 2018, Mr. Kushnerski was concerned that he might have diabetes. (Tr. 907.) His provider reassured him that his blood sugar level may not be indicative of diabetes, and also noted that Mr. Kushnerski was anxious, but that his memory, affect, and judgment were normal. (*Id.*) On February 8, 2018, Mr. Kushnerski was treated for chronic low back pain. (Tr. 914.) In the History of Past Illness section of the treatment notes, the provider noted that Mr. Kushnerski had paranoid schizophrenia. (*Id.*) His follow-up visit was unremarkable. (Tr. 914-16.)

On January 22, 2019, Dr. Goldman examined Mr. Kushnerski. (Tr. 957.) Dr. Goldman observed that Mr. Kushnerski was guarded with depressed, irritable, and labile mood and anxious affect. (*Id.*) His thought content was somatic and paranoid. (*Id.*) He had impaired concentration/attention span, fair judgment, poor insight, and memory within normal limits. (Tr. 958.)

Mr. Kushnerski attended a follow-up appointment with Dr. Goldman on May 6, 2019. Dr. Goldman observed that Mr. Kushnerski was guarded and suspicious, with depressed mood and slow speech. (Tr. 953.) Mr. Kushnerski also had paranoid thinking, impaired concentration, and delusions, but memory within normal limits. (Tr. 954.) Dr. Goldman noted that Mr. Kushnerski had low frustration tolerance and opined that Mr. Kushnerski was "unable [to] be gainfully employed." (Tr. 955.)

Mr. Kushnerski presented the emergency room after nausea and vomiting on May 15, 2019. (Tr. 941). The notes indicate that Mr. Kushnerski has a past medical history of paranoid schizophrenia. (*Id.*) Upon examination, Mr. Kushnerski was oriented and in no distress. (Tr. 942.) Mr. Kushnerski also had normal mood and affect. (Tr. 943.) On August 6, 2019, Mr. Kushnerski attended a follow-up appointment with Dr. Goldman. Dr. Goldman observed that Mr. Kushnerski was guarded with "slowing" motor activity, anxious affect, depressed and labile mood, pressured speech, somatic thought content, and auditory hallucinations. (Tr. 949-50.) He was oriented to time, person, and place, but he had impaired concentration/attention span and abstract reasoning and poor insight. (Tr. 950.) He had memory within normal limits and fair judgment. (*Id.*) At a medical visit for cold symptoms on July 26, 2019, Mr. Kushnerski was alert and oriented. (Tr. 1000-01.)

Dr. Goldman completed another Mental Residual Functional Capacity Questionnaire on October 10, 2019. (Tr. 982-87.) A summary of the findings appears at the "Non-Medical/Medical Opinions" section of this Report and Recommendation.

On November 5, 2019, Mr. Kushnerski met with Dr. Goldman. Dr. Goldman observed that Mr. Kushnerski was guarded, with "slowing" motor activity, anxious affect, depressed mood, pressured speech/language, somatic thought content, auditory hallucinations, impaired concentration/attention space, and poor insight. (Tr. 1021-22.) He had memory within normal limits, average intelligence, and fair judgment. (Tr. 1022.)

On November 6, 2019, Mr. Kushnerski visited express care for evaluation of urinary symptoms. (Tr. 1008.) Although he reported "significant" seasonal allergies and symptoms related to those allergies, he did not mention any psychiatric symptoms. (*See id.*) Upon examination, Mr.

Kushnerski was oriented and in no distress. (Tr. 1010.) Mr. Kushnerski also had normal mood, affect, and behavior. (Tr. 1011.)

On February 4, 2020, Dr. Goldman examined Mr. Kushnerski. Dr. Goldman observed that Mr. Kushnerski was depressed, with low energy and auditory hallucinations. (Tr. 1028.) Mr. Kushnerski also had poor insight with impaired abstract reasoning and attention/concentration span. (Tr. 1027). However, he had memory within normal limits, average intelligence, and fair judgment. (*Id.*) He was also oriented to time, person, and place. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Kushnerski met the insured status requirements of the Social Security Act through December 31, 2018. (Tr. 17.) The ALJ then determined that Mr. Kushnerski has not engaged in substantial gainful activity since January 1, 2014, the amended alleged onset date. (Tr. 17-18.) The ALJ next determined that Mr. Kushnerski has the following severe impairments: degenerative disc disease; myofascial pain dysfunction disorder; chronic pain syndrome; major depressive disorder; schizophrenia; and generalized anxiety disorder. (Tr. 18.) However, the ALJ determined that none of these impairments—individually or in combination— met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18-19.)

After consideration of the entire record, the ALJ determined that Mr. Kushnerski had the residual functional capacity to perform work at the light exertional level except he can never climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, kneel, and crouch; occasionally stoop and crawl; cannot work at unprotected heights; occasionally work in extreme heat and vibration; can perform simple tasks but not at a production rate pace; frequently interact with

supervisors and co-workers; occasionally interact with the public; and can tolerate routine workplace changes. (Tr. 20-24.)

The ALJ determined that Mr. Kushnerski is unable to perform any past relevant work. (Tr. 24-25.) The ALJ further determined that transferability of job skill is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Kushnerski is not disabled, whether or not Mr. Kushnerski has transferable job skills. (Tr. 25.) Considering Mr. Kushnerski's age, education, work experience, and residual functional capacity, the ALJ determined there are jobs that exist in significant numbers in the national economy that Mr. Kushnerski can perform. (Tr. 25-26.) Accordingly, the ALJ concluded that Mr. Kushnerski was not disabled within the meaning of the Social Security Act from January 1, 2014 through the date of the ALJ's decision. (Tr. 26.)

## V.    LAW AND ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether

the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

    **C.**  **Substantial Evidence Supports the Weight the ALJ Assigned to Dr. Goldman's Opinion.**

      Mr. Kushnerski argues that the ALJ did not articulate good reasons for failing to assign controlling weight to the opinion of his treating physician, Dr. Goldman. Because Mr. Kushnerski's application was filed before March 27, 2017, the treating physician rule applied to the evaluation of Dr. Goldman's opinion.[6] The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if her finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)(7) (internal quotation marks omitted).

      Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight which takes into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a

---

[6] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927.

whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)(6). The ALJ

is not required to explain how she considered each of these factors but must provide "good reasons"

for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); *see also Cole v. Astrue*,

661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight

to give a treating source opinion [when controlling weight has been denied,] the agency

specifically requires the ALJ to give good reasons for the weight actually assigned."). "These

reasons must be supported by the evidence in the case record, and must be sufficiently specific to

make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365,

376 (6th Cir. 2013) (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188,

at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence,

even whe[n] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r

of Soc. Sec*., 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d

at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

(internal quotation marks omitted).

The ALJ spent over four pages of his decision evaluating Dr. Goldman's opinions. (Tr.

623-26.) He explained that he did not find deficiencies in Dr. Goldman's opinion "based on his

professional qualifications or a lack of familiarity with [Mr. Kushnerski's] clinical status." (Tr.

623.) Instead, the ALJ's concern was the "inconsistencies between [Dr. Goldman's opinions] and

the observations and documentation from other clinicians in the record." (*Id.*); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Mr. Kushnerski contends that the ALJ did not offer good reasons for the alleged inconsistencies. (ECF No. 7, PageID#1068.) He asserts that the ALJ improperly determined that because Dr. Itin's patient notes do not contain any documentation of irritability, suspiciousness, delusions, or severe functional limitations, Dr. Goldman's opinion is not entitled to greater weight. (*Id.*) He argues that this lacks logic because Dr. Itin was evaluating Mr. Kushnerski for neurological conditions, not mental health symptoms. (*Id.*) Thus, Mr. Kushnerski states that this is the reason why Dr. Itin "did not further investigate nor discuss any of [his] psychological symptoms." (*Id.*) For the following reasons, this argument is not well-taken.

Mr. Kushnerski offers no support for such a conclusion. Here, although Dr. Itin is a neurologist, the ALJ noted Dr. Itin was aware that Mr. Kushnerski had a history of psychiatric treatment (Tr. 361) and described Mr. Kushnerski as anxious, perseverant, and tangential (Tr. 363). But as the ALJ observed, Dr. Itin did not cite any "florid" symptoms such as psychosis, distractibility, or unusual behavior. (Tr. 624.) Notably, contrary to Dr. Goldman's reports that Mr. Kushnerski was guarded, suspicious, tangential, and circumstantial with "distractable" attention/concentration, and impaired cognition (Tr. 388), Dr. Itin observed that Mr. Kushnerski's mental status examination revealed normal attention, concentration, memory, fund of knowledge, and language function. (Tr. 388.) Furthermore, Dr. Itin's treatment notes were inconsistent with some of the extreme limitations that Dr. Goldman opined. For example, as the ALJ pointed out, Dr. Itin's follow-up treatment notes gave no indication that Mr. Kushnerki had the "disorganized

thinking or behavior" described by Dr. Goldman. (Tr. 556-57, 562-63, 568-69, 579-83, 624, 877-79, 936-38.)

I also agree that Dr. Konieczny's mental status findings were "completely at odds" with Dr. Goldman's findings. (Tr. 620-21.) Dr. Konieczny observed that Mr. Kushnerski was able to perform simple clinical tests of memory and concentration such as performing serial subtraction of three, recalling three of three objects after a period of five minutes elapsed, and spelling a five-letter word backwards. (Tr. 396.); *see* 20 C.F.R. § 404.1502(g) ("signs" are objective evidence, which "must also be shown by observable facts that can be medically described and evaluated."). Unlike Dr. Goldman, Dr. Konieczny concluded that Mr. Kushnerski had no limitations in his ability to understand, remember, and carry out instructions or maintain attention, concentration and persistence in singly and multistep tasks. (Tr. 397.) And Dr. Goldman's mental status examinations, unlike Dr. Konieczny's findings, "do not contain much narrative description of [Mr. Kushnerski's] reported daily functioning that would inform a determination of [his] mental residual functional capacity." (Tr. 621.) Because Dr. Goldman's findings were in a checkbox form, with insufficient description of the clinical findings that supported his conclusion, the ALJ could find that Dr. Konieczny's findings could be afforded more weight than Dr. Goldman. *See* 2. C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

The ALJ further supported his reasoning for giving Dr. Goldman's opinions less weight because other medical sources, including Dr. Maleki, similarly were inconsistent with Dr. Goldman. For example, Dr. Maleki noted Mr. Kushnerski's history of psychiatric treatment but observed that Mr. Kushnerski remained coherent and fully oriented during his examination. (Tr.

624.) And the ALJ cited other medical visits for unrelated physical complaints in 2018 and 2019 where there was no mention of unusual behavior, or reports from Mr. Kushnerski regarding symptoms of depression, anxiety, or psychosis. (Tr. 624; *see* Tr. 907, 914-16, 941-43, 1000, 1008, 1011.)

Mr. Kushnerski emphasizes that Dr. Goldman was a treating specialist, and point outs that Dr. Goldman provided treatment notes that supported his opinion. (ECF No. 7, PageID#1066.) But the ALJ explicitly acknowledged these facts. Further, Ms. Kushnerski does not demonstrate that these facts were outcome determinative. That is because the ALJ could reject an opinion (even that of a treating source) that is inconsistent with other evidence. *See* 20 C.F.R. § 404.1527(c)(4); 20 C.F.R. § 416.927(c)(2)(6). To the extent that Mr. Kushnerski is implicitly inviting this Court to reweigh the evidence, this is an impermissible request. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017) ("The fact that there is some evidence in the medical records to support [a treating source's] conclusion is not enough to overturn the agency. 'The fact that a record may also possess substantial evidence to support a different conclusion than that reached by the ALJ or that a reviewing judge might have decided the case differently is irrelevant.'") (citations omitted). And Mr. Kushnerski does not point to any evidence the ALJ failed to address or that directly undermined the ALJ's logic. *See Helwagen v. Comm'r of Soc. Sec.*, No. 5:22-CV-01467, 2023 WL 372753, at *16 (N.D. Ohio Apr. 20, 2023) ("Helwagen has not pointed to any specific evidence that the ALJ failed to address, and which directly undermined the ALJ's finding that Helwagen could work at the light exertional level."), *report and recommendation adopted¸* 2023 WL 3726575 (N.D. Ohio May 30, 2023).

Mr. Kushnerski further argues that it was improper for the ALJ to state that the Dr. Goldman's forms had not been "created and cleared" by the Social Security Administration. (ECF

No. 7, PageID#1069 (citing Tr. 625.)) Mr. Kushnerski is correct that "created and cleared" forms are not required. (*Id.*) Yet, Mr. Kushnerski fails to address the remaining reasoning that the ALJ provided for discounting Dr. Goldman's forms. The ALJ reasoned that Dr. Goldman's forms used terminology that was "not fully consistent" with the agency's typical "paragraph B" criteria language for the evaluation of mental disorders. (Tr. 624.) And as demonstrated above, this reason was not the sole basis for the ALJ's weighing of Dr. Goldman's opinion.

Finally, Mr. Kushnerski attempts to connect Dr. Goldman's opinion with Dr. Konieczny's report. (*See* ECF No. 7, PageID#1069.) Specifically, Mr. Kushnerski points out that Dr. Konieczny opined that Mr. Kushnerski "would have diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to typical pressure situations in the work setting" as a result of his depressive symptoms. (Tr. 397; ECF No. 7, PageID#1069.) But the ALJ did not ignore this finding. In fact, the ALJ cited this portion of Dr. Konieczny's report and assigned the appropriate corresponding limitation in the RFC, including limiting Mr. Kushnerski to simple tasks that do not have production rate pace requirements or more than "routine changes." (Tr. 616, 622, 626.) To the extent that Mr. Kushnerski believes that Dr. Konieczny's findings support Dr. Goldman's opinion, that argument is not well-taken because Dr. Konieczny's findings were inconsistent with Dr. Goldman's reports. As the ALJ noted, Dr. Konieczny "is a trained psychologist, and his observations of the claimant were completely at odds with Dr. Goldman's clinical notes." (Tr. 612; *see* Tr. 396-97, 546-47.)

In sum, Mr. Goldman does not demonstrate that the ALJ's weighing of Dr. Goldman's opinion is not supported by substantial evidence. Accordingly, I recommend that the Court reject this assignment of error.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: April 8, 2024                                    /s Jennifer Dowdell Armstrong
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate

the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).